[Cite as *Cleveland v. Freeman*, 2013-Ohio-4030.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 99131**

## CITY OF CLEVELAND

PLAINTIFF-APPELLEE

vs.

## ERIC FREEMAN

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED IN PART;
REVERSED IN PART AND VACATED

Criminal Appeal from the
Cleveland Municipal Court
Case Nos. 2012 CRB 005400 and 2012 CRB 005402

**BEFORE:** Kilbane, J., Rocco, P.J., and Keough, J.

**RELEASED AND JOURNALIZED:** September 19, 2013

**ATTORNEYS FOR APPELLANT**

Robert L. Tobik
Chief Public Defender
Erika B. Cunliffe
Assistant Public Defender
310 Lakeside Avenue
Suite 200
Cleveland, Ohio    44113

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
Stephanie L. Jerlstrom
Assistant County Prosecutor
The Justice Center - 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

Victor R. Perez
Chief City Prosecutor
The Justice Center - 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

MARY EILEEN KILBANE, J.:

{¶1} Defendant-appellant, Eric Freeman, appeals from his convictions for assault and engaging in unlicensed security services. For the reasons set forth below, we affirm the conviction for assault, and reverse and vacate the conviction for engaging in unlicensed security services.

{¶2} On February 24, 2012, following an altercation with a patron at Touch Supper Club on February 19, 2012, the defendant was charged with carrying a concealed weapon, engaging in unlicensed security services, aggravated menacing, and assault. All charges are misdemeanors of the first degree. The defendant pled not guilty and the matter proceeded to a jury trial on September 10, 2012.

{¶3} The city of Cleveland ("the City") presented the testimony of the complaining witness, Alden Tinnin ("Tinnin"), and witnesses Anthony Trzaska ("Trzaska"), Mark Thompson ("Thompson"), Kate Dawson ("Dawson"), and Cleveland Police Officer James Hummel ("Officer Hummel") and Sergeant Edward Lentz ("Sergeant Lentz").

{¶4} Tinnin testified that he is a securities compliance officer at a bank. On the night of Saturday, February 18, 2012, he, Trzaska, and Thompson went to the Brite Winter Festival, an organized event featuring entertainment in all the surrounding restaurants and bars in Ohio City. Tinnin testified that by 10:30 p.m., he had consumed two beers, and his group went to the Touch Supper Club on Lorain Road in Ohio City. As Tinnin entered the restaurant, the defendant was speaking with someone and Tinnin did not

realize that the defendant was checking identification. According to Tinnin, the defendant became upset that Tinnin's group had walked past him without showing their identification, and he began to curse at them. Tinnin and his friends left; however, a few minutes later, they decided to go back inside and explain that they had gotten off to a bad start and wanted to reenter the restaurant. The defendant refused to allow them inside, so Tinnin told the defendant that he looked stupid and then turned to leave. As Tinnin reached the door, he heard the defendant coming after him, so he closed the door behind him as he left. The defendant pushed open the door, grabbed Tinnin, and put him into a headlock. Tinnin broke free and the defendant then grabbed him again. During the struggle, the window broke. Once outside, the defendant pushed Tinnin to the ground and sat on him until the police arrived. Tinnin's friends videotaped the altercation and called police.

{¶5} Tinnin next testified that, after the police arrived, they handcuffed him and placed him in the squad car. He and his friends explained what had happened, and the police released him. Tinnin was transported to the hospital by ambulance and treated for cuts and bruises. He filed a police report about the incident ten days later.

{¶6} Trzaska and Thompson testified that the group intended to listen to music in the basement of Touch Supper Club. As they entered, they told Tinnin to proceed to a stairwell to the right of the door. According to Trzaska, in the past, no one checked identification at the door, and therefore, they did not expect to be stopped. The defendant abruptly stopped Tinnin, but he did not ask for identification and simply told him to leave.

The group complied, but then decided to reenter and try to explain that there had been a misunderstanding. Tinnin reentered, but a moment later, the defendant forced him out, and he came crashing through the door. Tinnin's shirt was torn off, and the defendant put Tinnin in a "pretzel hold" and slammed his head into an iron gate. Tinnin struggled, and the window was shattered. The defendant then got Tinnin to the ground and got on top of him. Trzaska and Thompson became concerned that the defendant was hurting Tinnin. They videotaped some of the incident, and the video was played for the jury.

{¶7} Dawson testified that she was coordinating entertainment for the Brite Winter Festival. At around midnight, as she checked on the entertainment at Touch Supper Club, she observed the defendant pushing through a door and then throwing a man through a window. Dawson did not observe the man fighting back. The defendant got the man onto the ground and held him down, as his friends shouted for the defendant to stop. Dawson further testified that following the incident, the defendant left her a phone message, accusing her of bringing drunk people to the restaurant and falsely claiming that he was waving a gun.

{¶8} Officer Hummel testified that he responded to a call that a bouncer and a patron were fighting outside of a bar. He observed Tinnin on the ground and the restaurant owner, Robert Ivanov ("Ivanov"), on top of him. According to this witness, Tinnin was intoxicated. He later learned that a gun was recovered from the scene. He testified that the defendant did not immediately mention that he had a gun, but the officer

admitted on cross-examination that the defendant showed him his permit for carrying a concealed weapon.

{¶9} Sergeant Lentz testified that the defendant continued to threaten Tinnin at the scene. He interviewed both the defendant and Tinnin at the scene, as well as Trzaska, Thompson, Dawson, and Ivanov. When Sergeant Lentz interviewed the defendant, he stated that he was "working the door" and checking identification, and that Tinnin walked past him into the establishment and was belligerent, so he kicked him out and then held him down. The defendant denied assaulting Tinnin. He then asked the officer if he wanted his concealed weapon permit, and the officer asked if the defendant was armed. The defendant replied that he was armed. The officer then disarmed the defendant and arrested him for failing to promptly notify him that he had a concealed weapon and that the permit is for personal safety only and does not authorize security for others.

{¶10} The trial court denied a motion for acquittal, and the defendant elected to present evidence. Allison Popovich ("Popovich"), a bartender at Touch Supper Club, testified that the defendant is part of the managerial staff and is authorized to control billing, procedures, the security system for the establishment, and the training of new employees. On the night of the incident, all of the tables of the restaurant were occupied, and the bar was extremely crowded because it was near the last stop of the Brite Winter Festival parade. The defendant was overseeing business operations, "walking around, making sure everything was going according to plan." There were many issues involving intoxicated patrons attempting to get drink discounts, and the defendant was responding to

employee questions and issuing instructions. Popovich further testified that she has never seen the defendant threaten anyone with a gun. She heard glass breaking, but she did not see what transpired between the defendant and Tinnin.

{¶11} Attorney Christopher Thomarios ("Thomarios") testified that he provided representation for the defendant following his arrest in this matter. Thomarios met with the defendant at the county jail and observed injuries to his fingers and elbow, which Thomarios photographed.

{¶12} Todd Urmson ("Urmson"), a real estate property manager, testified that he arrived at Touch Supper Club and observed broken glass all over the sidewalk and the defendant restraining Tinnin. According to Urmson, Tinnin was struggling and Ivanov and the defendant were telling him to relax and that police would be there soon.

{¶13} The defendant next testified that he is the assistant manager at Touch Supper Club. He obtained his concealed weapon permit about one year prior to the incident and always carries it with him. As to the altercation with Tinnin, the defendant testified that Tinnin pushed past other patrons to get inside, and the defendant stopped him because he did not want intoxicated persons to enter. According to defendant, Tinnin was walking sideways, slurring his words, and appeared to be "drugged out of his mind." The defendant said, "Hey," as Tinnin pushed into the restaurant, and Tinnin said, " F– you, who are you?" Tinnin left, but a few moments later he returned and apologized. The defendant refused to let him inside and said "come back when you are sober." At that point, Tinnin spit on him and fled. The defendant followed him, and Tinnin

"hockey-checked" the window, causing it to shatter and injuring the defendant's finger. The defendant further testified that Tinnin started "freaking out" and kicking at his feet, so he and the owner held him until the police arrived.

{¶14} The defendant further testified that he kept his weapon in its shoulder holster but Tinnin must have felt it as they struggled. The defendant further testified that he showed his driver's license and his concealed carry permit to the officers immediately after they arrived on scene. He was informed that he was being arrested for having a weapon in a liquor establishment and not for assault. As to his contact with Dawson, the defendant stated that it was Dawson's responsibility to pay the DJ who was performing in the basement of the restaurant.

{¶15} Timothy Johnson ("Johnson") testified that he was at Touch Supper Club at the time of the incident. He observed the defendant standing at the hostess stand near the door. Tinnin entered and the defendant then quickly moved toward the door and asked Tinnin to leave. They began to shout at one another, and the defendant attempted to restrain Tinnin to keep from being punched. Johnson next observed the man push the defendant through the front window of the restaurant. Johnson called the police. Tinnin's friends told the police that the defendant pushed Tinnin through the window, but Johnson testified that Tinnin was the aggressor and pushed the defendant through the window.

**{¶16}** The jury subsequently acquitted the defendant of the charge of carrying a concealed weapon and aggravated menacing, but convicted him of engaging in unlicensed security services and assault.

**{¶17}** On October 3, 2012, on the unlicensed security conviction, the trial court sentenced the defendant to 180 days of incarceration, which the court suspended, and a $1,000 fine, with $800 suspended; on the assault conviction, the trial court sentenced the defendant to 180 days of incarceration, with 150 days suspended, and a $1,000 fine, with $800 suspended on the assault conviction. The defendant now appeals and assigns two errors for our review.

Assignment of Error One

Eric Freeman was deprived of his liberty without due process of law where the jury found him guilty of engaging in a security services business without a license to do so even though the evidence supporting that case was insufficient as a matter of law.

**{¶18}** A challenge to the sufficiency of the evidence supporting a conviction requires a court to determine whether the prosecution has met its burden of production at trial. *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541. On review for sufficiency, courts are to assess not whether the prosecution's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. *Id.* The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential

elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d

259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶19} In this matter, the defendant was convicted of violating R.C. 4749.13, which

provides in pertinent part:

> No person shall engage in the business of private investigation, the business
> of security services, or both businesses in this state unless he is licensed
> pursuant to this chapter.

{¶20} As an initial matter, we note that R.C. 4749.01(D)(1) defines "business of

security services" as "furnishing, for hire, watchmen, guards, private patrolmen, or other

persons whose primary duties are to protect persons or property." R.C. 4749.03 requires

all private security guard providers and private investigators, whether individuals or

corporations, to be licensed according to the statute. *State v. Smith*, 7th Dist. Mahoning

No. 02 CA 227, 2004-Ohio-4285, ¶ 60.

{¶21} Pursuant to  R.C. 4749.01(H), however,

> "Private investigator," "business of private investigation," "security guard
> provider," and "business of security services" do not include:
>
> * * *
>
> (6) An employee in the regular course of the employee's employment,
> engaged in investigating matters pertinent to the business of the employee's
> employer or protecting property in the possession of the employee's
> employer, provided the employer is deducting all applicable state and federal
> employment taxes on behalf of the employee and neither the employer nor
> the employee is employed by, associated with, or acting for or on behalf of
> any private investigator or security guard provider[.]"  (Emphasis added.)

{¶22} Here, the City was required to prove that the defendant engaged in the

business of security services, and that the defendant was not licensed to perform security

services. There was no evidence that he is employed by, associated with, or acting for or on behalf of any private investigator or security guard provider. *See State v. Rutland*, 152 Ohio App.3d 59, 2003-Ohio-1425, 786 N.E.2d 530, ¶ 23.

{¶23} The City's evidence demonstrated that the defendant became upset that Tinnin's group had walked past him without showing their identification, asked them to leave, and refused to allow them to reenter the restaurant later. From the video, it is clear that he was not wearing a security uniform. The City did not present evidence that the defendant was engaged in the "business of security services," or that he was hired by the restaurant to serve as a watchman, guard, or private patrolman. The City's evidence likewise failed to establish that the defendant's primary duties were to protect persons or property. *Compare State v. Rutland*, 152 Ohio App.3d 59, 2003-Ohio-1425, 786 N.E.2d 530, ¶ 23 (defendant in uniform, driving a vehicle with a siren, engaged in providing a security service while he was escorting the funeral procession).

{¶24} Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact had no evidence from which to conclude that the defendant's primary duties at the restaurant were to protect persons or property, and that he was in the business of security services. To the contrary, the overwhelming evidence of record indicates that the defendant is part of the managerial staff at the restaurant, that there were numerous patrons in the restaurant, many of whom were intoxicated, that he was overseeing business operations and responding to issues involving patrons attempting to get drink discounts, answering employee questions, and issuing instructions. With regard to the incident at

issue, the overwhelming evidence of record indicated that the defendant was near the door when Tinnin entered, and that the defendant was speaking with someone else in the restaurant. After Tinnin entered without presenting identification, the defendant spoke with him and investigated Tinnin's entry into the restaurant as part of the regular course of his employment as a manager. The evidence did not indicate that the defendant is employed by, associated with, or acting for or on behalf of any private investigator or security guard provider.

{¶25} The first assignment of error is well taken, and the judgment convicting the defendant of engaging in unlicensed security services in violation of R.C. 4749.13 is reversed and the conviction vacated.

Assignment of Error Two

Eric Freeman was deprived of his liberty without due process of law where his conviction for assault is contrary to the manifest weight of the evidence.

{¶26} When reviewing a claim challenging the manifest weight of the evidence, the court, after reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541. In addition, this court must remain mindful that the weight to be given the evidence and the credibility of the witnesses are matters left primarily to the jury. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967).

**{¶27}** The defendant was convicted of assault, in violation of Cleveland Codified Ordinances 621.03, which provides in relevant part that no "person shall knowingly cause or attempt to cause physical harm to another * * * [or n]o person shall recklessly cause serious physical harm to another."

**{¶28}** After reviewing the entire record, we conclude that the defendant's conviction for assault is not against the manifest weight of the evidence. The evidence presented by the City demonstrated that Tinnin reached the door, and the defendant came after him, grabbed him, and put him into a headlock. After Tinnin broke free, the defendant then grabbed him again. A struggle ensued, and the window was shattered. The defendant put Tinnin in a "pretzel hold," then pushed him to the ground, got on top of him, and held him until the police arrived. The jury did not lose its way or create a manifest miscarriage of justice in convicting the defendant of the offense of assault.

**{¶29}** The second assignment of error is without merit.

**{¶30}** Accordingly, we affirm the conviction for assault, and reverse and vacate the conviction for engaging in unlicensed security services.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cleveland Municipal Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, JUDGE

KENNETH A. ROCCO, P.J., and
KATHLEEN ANN KEOUGH, J., CONCUR